NASCO, INC., Plaintiff, Appellant,

v.

PUBLIC STORAGE, INC.,
Defendant, Appellee.

PUBLIC STORAGE, INC., Defendant,
Cross–Appellant,

v.

NASCO, INC., Plaintiff, Cross–Appellee.

Nos. 97–1340, 97–1457.

United States Court of Appeals,
First Circuit.

Heard Sept. 12, 1997.

Decided Oct. 8, 1997.

Joseph G. Abromovitz, with whom John G. Balzer and Abromovitz & Leahy, P.C., were on brief, for plaintiff, appellant.

James E. Carroll, with whom Kristen M. Lacovara and Cetrulo & Capone were on brief, for defendant, appellee.

Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge, and KEETON,* District Judge.

LYNCH, Circuit Judge.

One novel issue under Mass. Gen. Laws ch. 93A is presented by this appeal: May a chapter 93A § 11 claimant be awarded attorney's fees where the only "adverse effects" it suffers from the violation are the incurring of valid bills which it does not pay because it is unable to do so? We answer this question in the affirmative in light of Massachusetts precedent and the policy behind the attorney's fees provisions of chapter 93A.

NASCO, Inc., a family business in financial trouble, attempted to sell its principal asset, an old brick warehouse in Chelsea, Massachusetts. Lengthy negotiations with Public Storage Inc. ("PSI"), a California-based company, produced a purchase and sale agreement in February of 1990 which NASCO thought constituted an effective contract for the sale of the building, but which a jury did not. Both the trial judge and the jury (in an advisory capacity) thought that PSI nonetheless had engaged in unfair and deceptive business practices in the course of its dealings, although the judge found so for only a limited period of time.

PSI escaped an award of significant damages against it when the judge found that, while NASCO had suffered harm during this

* Of the District of Massachusetts, sitting by designation.

limited period, NASCO had not shown monetary damages. The judge did award NASCO attorney's fees and costs on that basis. But the award was only a fraction of what NASCO had sought, because NASCO had failed to document the fees for its successful claim under chapter 93A separately from the fees for its unsuccessful contract claim. Conceding the jury verdict on the contract claim, NASCO appeals, saying that the evidence showed that PSI violated chapter 93A for a longer period, that NASCO suffered damages of at least $700,000, and that it should have received more in attorney's fees. PSI also appeals, arguing that the evidence does not show any violation of chapter 93A at all. We affirm.

## I.

NASCO, Inc. manufactured bedding products at a factory located in a large brick building in Chelsea. NASCO's financial difficulties convinced the owners by early 1987 to wind down the business by selling off the assets, paying creditors, and distributing the remainder to the shareholders. NASCO's principal asset was the Chelsea property, which an appraiser then valued at $4 million. The property was subject to a $40,000 first mortgage held by the Small Business Administration and to an $800,000 second mortgage held by Shawmut Bank.

NASCO's property interested Public Storage, Inc., a corporation that operates self-storage facilities throughout the United States. In February 1987, NASCO and PSI executed a purchase and sale agreement for the property, reciting a price of $3.6 million. The parties terminated that agreement by mutual consent after learning that Chelsea's zoning laws did not permit the use of the property as a mini-warehouse. PSI remained interested in the project, and pursued relief from the zoning restriction at its own expense, both in administrative appeals and ultimately in the courts.

During this time, NASCO actively sought other buyers for the property while continuing negotiations with PSI. In September 1988, Cambridge Investment Group offered $4 million. In February 1989, Rauseo & Co. offered $3.4 million. PSI was kept informed of the offers. PSI continued to express its interest in the property, contingent on a favorable outcome of its zoning litigation, and offered to increase its offering price to $3.8 million. Neither of the other offers resulted in a sale.

Throughout this period, NASCO had difficulty making its payments on the Shawmut loan. By the summer of 1989, shareholders had loaned the corporation a total of $268,000 in personal funds and could no longer afford to keep current on the loan payments. Anticipating a favorable outcome in the pending land court litigation, PSI representatives persuaded Shawmut not to foreclose on the property.

In November 1989, the land court ruled in favor of PSI on the zoning issue. NASCO and PSI began exchanging drafts of a second purchase and sale agreement (the "1990 P & S"). On January 31, 1990, all necessary PSI representatives signed the new agreement; on February 2, 1990, NASCO representatives counter-signed. The agreement contained an "expiration clause" which PSI had demanded and which the parties had negotiated. The clause provided:

> 11. *Expiration.* This Agreement shall be of no force or effect unless, within seven (7) days after the date this Agreement has been executed by Seller and Buyer's Real Estate Representative, an Officer, the Secretary or Assistant Secretary of Buyer, executes this Agreement on behalf of Buyer and delivers to Seller an executed copy of this Agreement signed on behalf of Buyer by both its Real Estate Representative and either the Secretary or an Assistant Secretary of Buyer, together with the Deposit.

Both PSI's local real estate representative and its secretary had signed the 1990 P & S on January 31, but PSI never paid the required deposit.

Between early February 1990 and March 19, 1990, NASCO inquired about the deposit several times, both orally and by letter. PSI did not respond by stating that the 1990 P & S had expired because the deposit had not been paid, but instead claimed that the funds

were tied up in its own internal bureaucracy. The trial judge found that in other respects PSI continued to act as though it still intended to purchase the property under the agreement. Specifically, PSI employees requested access to the facility and asked NASCO to restore electrical power. However, in the meantime PSI continued refining its own economic forecasts of the viability of the Chelsea property as a self-storage warehouse. PSI's statistical analysis indicated that the project would only be viable at a price between $1 million and $2 million lower than the 1990 P & S provided. PSI decided to abandon the project. On March 19, 1990, PSI informed NASCO, by letter, that PSI had "decided to terminate" the 1990 P & S. The letter did not refer to the expiration clause. NASCO informed its bank that the deal with PSI had evaporated, and within two months the property was sold at a foreclosure sale for $852,000.

## II.

NASCO sued PSI for breach of contract and violation of chapter 93A. The district court initially granted PSI's summary judgment motion on both counts, reasoning that the expiration clause was unambiguous, requiring the payment of the deposit to bind PSI, and that NASCO could not establish a violation of chapter 93A in the absence of an enforceable agreement. This Court reversed, finding the expiration clause ambiguous, and remanded for trial. *See NASCO, Inc. v. Public Storage, Inc. (NASCO I )*, 29 F.3d 28 (1st Cir.1994).

The case was tried before a different judge. NASCO amended its complaint to add claims for breach of the implied covenant of good faith and fair dealing and for estoppel. Before trial, PSI changed its legal theory, admitting the existence of a contract prior to the expiration of the seven-day period, and the parties dismissed the estoppel claim. Following a fourteen-day trial, a jury ruled for the defendant on the contract claim and on the implied covenant of good faith claim. Serving as an advisory jury only, the jury answered interrogatories finding in favor of NASCO on the chapter 93A claim, and recommended damages of $700,000. Judge

Lindsay, not accepting the advisory jury's findings, ruled that there was no violation of chapter 93A prior to the execution of the 1990 P & S on February 2 because the parties did not consider the sale to be a "firm deal" until that document was signed.

The district court did find that PSI had violated chapter 93A through its deceptive conduct following the expiration of the 1990 P & S in an attempt to keep its options open, but ruled originally that NASCO had not been damaged thereby. The district court amended its judgment to reflect "adverse effects" from PSI's deceptive conduct. Specifically, it found that PSI's conduct led NASCO to incur additional legal expenses and the expense of restoring electricity to the facility following the expiration of the contract. The district court ruled that NASCO had not proven the amount of these damages and so could not recover them, but that the existence of these "adverse effects" entitled NASCO to an award of attorney's fees for the chapter 93A claim only. The district court awarded $35,000 in attorney's fees and $4,097 in costs, one-fifth of what NASCO requested, after discounting the portion of plaintiff's fee request that it considered related to the unsuccessful contract claim.

## III.

Both sides appeal. NASCO does not challenge the jury's finding on the contract and implied covenant of good faith claims, but rather appeals the judge's finding that PSI's conduct prior to February 2, 1990 did not violate chapter 93A. NASCO argues that the judge's finding goes against the weight of the evidence and disregards the advisory jury's findings. NASCO also claims the amount of the attorney's fees awarded was "arbitrary and capricious." PSI challenges the judge's finding of a chapter 93A violation, claiming it is against the weight of the evidence, and challenges the judge's finding of "adverse effects" supporting the attorney's fee award. PSI does not challenge the amount of attorney's fees awarded.

## IV.

*The Chapter 93A Violation*

When this case was previously before this court, we reversed summary judgment for defendant on both the contract and the chapter 93A claim. As to the chapter 93A claim, we noted that the evidence could be read to infer that PSI:

(1) signed the Agreement in order to obligate NASCO to deliver the property to it for $3,575,000.00, if PSI so chose;

(2) intentionally breached its obligation to pay the $20,000.00 deposit, knowing full well that NASCO was in no position to repudiate the Agreement on the basis of PSI's non-payment of the deposit;

(3) used the period of time after the signing of the Agreement to investigate the property further and to determine whether it should honor the Agreement; and

(4) then used its wrongful non-payment of the deposit in order to avoid its obligations under the Agreement.

*NASCO I,* 29 F.3d at 34 (footnote omitted). That evidence and more was introduced at trial.

■ We review basic chapter 93A law. A party is not exonerated from chapter 93A liability because there has been no breach of contract. The law of Massachusetts has been clear on this point since at least the decision of the Supreme Judicial Court in *Jet Line Services, Inc. v. American Employers Ins. Co.,* 404 Mass. 706, 537 N.E.2d 107 (1989). The court in *Jet Line* held that there was no coverage under the contract of insurance between plaintiff and defendant. Nonetheless, the conduct of the insurance company in leading the insured to believe there was coverage constituted an unfair and deceptive trade practice. *Accord Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.,* 403 Mass. 722, 532 N.E.2d 660, 664 (1989)(violation of chapter 93A § 11 need not be premised on a violation of an independent common law or statutory duty). The fact that the jury found no breach of contract does not preclude NASCO's chapter 93A claim.

■ While the rubric of "rascality" as the test of whether something is "unfair or de-ceptive" has been oft-recited, both the Supreme Judicial Court and this court have noted that such rhetoric is "uninstructive." *See Cambridge Plating Co., Inc. v. Napco, Inc.,* 85 F.3d 752, 768 (1st Cir.1996); *Massachusetts Employers Ins. Exch. v. Propac–Mass, Inc.,* 420 Mass. 39, 648 N.E.2d 435, 438 (1995). We apply the standards of *Propac* and *Jet Line* and easily hold that the evidence was not so overwhelming as to require the trial court to find that PSI acted in an unfair or deceptive manner before February 2, 1990.

■ The evidence adequately supports the trial judge's conclusion that before February 2, 1990 NASCO was aware that, in the absence of a signed P & S with PSI, it could not be assured of a sale of the Chelsea property. Thus, under *Pappas Indus. Parks, Inc. v. Psarros,* 24 Mass.App.Ct. 596, 511 N.E.2d 621, 623 (1987), the judge could readily conclude that it was not reasonable for NASCO to rely on PSI's representations before February 2. While the judge could have reached the opposite conclusion, as did the advisory jury, he was not required to do so.[1]

■ PSI in turn argues that there was no violation of chapter 93A after February 2, 1990. In *Propac–Mass,* 648 N.E.2d at 438, the Supreme Judicial Court directed that the focus be on "the nature of the challenged conduct and on the purpose and effect of the conduct." As in *Propac–Mass,* the defendant here continued to act as though a legal relationship were in place when it was not and the conduct was unilateral and self-serving. In both cases, some harm was also done to third parties—in this instance, the closing attorney and the electric company. In each instance, the plaintiff was particularly vulnerable and the defendant's unfair conduct gave it greater leverage.

The record also easily supports the trial judge's findings that after February 2, 1990 NASCO believed it had a firm deal with PSI and that such a belief was reasonable and induced by PSI's actions. *Cf. Greenstein v.*

---

**1.** The advisory jury's opinion does not bind the court. *See Wyler v. Bonnell Motors, Inc.,* 35 Mass.App.Ct. 563, 624 N.E.2d 116, 118–19 (1993).

*Flatley,* 19 Mass.App.Ct. 351, 474 N.E.2d 1130 (1985). As the trial judge found:

> PSI used the period between February 2, 1990 and March 19, 1990 to complete its assessment of the economic soundness of the purchase of the Chelsea Property. To keep all of its options open, PSI unfairly and deceptively led NASCO to believe that the parties had entered into a binding agreement and the deposit was delayed merely because of administrative ineffi-ciencies. All the while, PSI actually with-held the deposit because it reasoned that the failure to pay the deposit would permit PSI to repudiate the agreement if, after review, the purchase of the Chelsea Prop-erty seemed not be an economically advan-tageous transaction. Thus when PSI de-termined that the purchase was indeed economically unsound, it instructed its law-yer to advise NASCO that the deal was off.

During February and March, NASCO's at-torney and broker made several inquiries concerning the late deposit. They testified that PSI reassured them that the delays were simply the result of PSI's bureaucratic procedures, and that PSI never indicated that the contract had expired. It was only after the filing of NASCO's lawsuit that PSI claimed the contract had expired because of the unpaid deposit.

*Attorney's Fees*

■ The more difficult question is whether NASCO suffered any adverse effects suffi-cient to trigger liability for attorney's fees under chapter 93A. In *Jet Line,* the court held that "Under § 11, a plaintiff must be entitled to relief in some other respect in order to be entitled to an award of attorneys' fees.... Under § 11, [the] unfair or decep-tive conduct must have had some adverse effect upon the plaintiff, even if it is not quantifiable in dollars." *Jet Line,* 537 N.E.2d at 115. Because this is a § 11 busi-ness case, and not a § 9 consumer case, the *Jet Line* rule applies.

The trial judge found that NASCO had not shown that there were any other potential buyers for the building in this Febru-ary/March 1990 time frame, so NASCO could not claim the sale value of the building as damages. The district court found two ele-ments of damage: NASCO, believing it had a contract, incurred legal fees in anticipation of a closing, and NASCO suffered losses in the form of the costs associated with restoring power to the Chelsea property at the request of PSI. Such effects would indeed meet the *Jet Line* requirement of "adverse effects." *See also Star Financial Services, Inc. v. AASTAR Mortgage Corp.,* 89 F.3d 5, 15 (1st Cir.1996) (award of injunctive relief based on demonstrated risk of future actual loss con-stitutes an unquantifiable "adverse effect" under *Jet Line* ); *Jillian's Billiard Club of America, Inc. v. Beloff Billiards, Inc.,* 35 Mass.App.Ct. 372, 619 N.E.2d 635, 638 (1993) (where no damages awarded, value of what was taken or start up costs, which might have been quantifiable, are sufficient to sup-port award of attorney's fees).

PSI argues that the record does not sup-port these conclusions for two reasons. First, while NASCO incurred legal fees for work by counsel in anticipation of a closing, there is no evidence that it ever paid those bills, and is not now obligated to pay as any claim for legal services is barred by the statute of limitations. Second, NASCO did not reactivate electricity at PSI's request during the Chapter 93A violation period and it did not pay for the electric expenses be-cause it took the position that PSI was re-sponsible to pay those costs and because NASCO had no money to pay these bills.

The record shows that Peter Cooney, NASCO's broker for the property, was con-tacted by Kevin Kinneavy of PSI, who re-quested that power be restored to the prop-erty. In response, NASCO's attorney, Thomas Bennet, sent a letter dated February 12, 1990 to Boston Edison requesting that power be restored to the property. Mr. Bennet sent copy of this letter to Mr. Kin-neavy. Witnesses testified that power was subsequently restored to the property, and Harvey Shapiro, NASCO's vice president, testified that Boston Edison billed NASCO after February of 1990, but that these bills were not paid. Attorney Bennet's billing records, which listed several entries connect-ed with the sale of the Chelsea property

between February 2 and March 19, 1990, were also in evidence.

In light of this evidence that NASCO incurred both legal and electrical bills and the trial judge's implicit finding that the bills were in fact incurred, PSI's argument evolves to a contention that because NASCO did not pay these bills, it has suffered no "adverse effects" under *Jet Line* and is not entitled to damages. NASCO's failure to pay the bills means that it did not recover damages for those liabilities, but it does not mean that NASCO did not suffer adverse effects. To the extent that PSI's objection is that the bills were not valid or the debts were not validly owed, the trial judge implicitly found against PSI. It would, of course, be a different matter if the bills were inflated or fictitious. To the extent that PSI's objection is that there were valid debts, but NASCO did not pay them, the decision of the Supreme Judicial Court in *DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85, 449 N.E.2d 1189 (1983) is instructive. Although *DiMarzo* dealt with a judgment and not a mere bill, the Supreme Judicial Court held that entry of a judgment constitutes a loss of money for purposes of chapter 93A. In addition, *DiMarzo* said, "[t]he loss does not turn on whether the judgment has been satisfied." *Id.* 449 N.E.2d at 1196. While a judgment is admittedly different than a bill, that a valid debt (evidenced by a bill) has not been paid does not mean that there has been no adverse effect.

■ PSI's unfair and deceptive practices caused NASCO to incur these legal and electrical bills. This worsened NASCO's financial position and put it at risk of suit on these bills. PSI should not avoid attorney's fees for its behavior because NASCO could not pay bills it would not have incurred had PSI not violated the law. Indeed, PSI's position seems contrary to the intent of chapter 93A. Vulnerable, struggling companies in bad bargaining positions are more likely to need the protection of chapter 93A than robust, successful companies. If we adopt PSI's position, impecunious businesses, unable to pay their bills and trying to sell their assets in order to do so, would be placed on a different footing under chapter 93A than more solvent plaintiffs. The purpose of the chapter 93A

§ 11 attorney's fees provision is to deter businesses from engaging in unfair and deceptive trade practices where those practices have adverse effects. *See Commonwealth v. Fall River Motor Sales, Inc.*, 409 Mass. 302, 565 N.E.2d 1205, 1214 (1991); *Manning v. Zuckerman*, 388 Mass. 8, 444 N.E.2d 1262, 1266 (1983) ("Through the imposition of penalties for specific unfair or deceptive acts or practices between particular individuals, the statute seeks to deter these practices and to reduce the general danger to the public arising from the potential for such unscrupulous behavior in the marketplace."). We conclude that NASCO was eligible for an award of attorney's fees.

■ NASCO argues that the district court's fee award was too small. But *Jet Line*, 537 N.E.2d at 114–15, holds that an attorney's fees award should be adjusted to eliminate any award for legal services rendered in connection with unsuccessful claims. The district court acted well within its discretion when it decided to award NASCO only part of the attorney's fees and costs NASCO had incurred in the course of this litigation. *See DiMarzo*, 449 N.E.2d at 1202 ("The amount of reasonable attorney's fees under c. 93A is within the broad discretion of the trial judge."); *Linthicum v. Archambault*, 379 Mass. 381, 398 N.E.2d 482, 488 (1979), *overruled in part on other grounds by Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 640 N.E.2d 1101, 1105 (1994).

## V.

To conclude, we hold that the district court correctly applied the law of chapter 93A to this case. The record clearly supports the district court's finding that PSI's actions from February 2 to March 19 of 1990 violated chapter 93A's prohibition of unfair and deceptive trade practices. The district court was also correct to conclude that NASCO suffered adverse effects during this period for which attorney's fees could be awarded. The judgment of the district court is therefore *affirmed.* Costs are awarded to NASCO.